**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Richmond Division)**

| | |
|---|---|
| **JOHN HICKMAN** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 3:26-cv-00450** |
| **CAPITAL ONE FINANCIAL CORPORATION** | **Jury Trial Demanded** |
| **Defendant.** | |

## COMPLAINT

Plaintiff John Hickman ("Plaintiff" or "Mr. Hickman"), by and through undersigned counsel, respectfully submits this Complaint against Defendant Capital One financial Corporation ("Defendant" or "Capital One"), stating as follows:

## NATURE OF ACTION

1.      Plaintiff brings this action against Defendant seeking damages for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq. ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), and the Virginia Human Rights Act, as amended by the Virginia Values Act, Va. Code. § 2.2-3900, et seq. ("Virginia Law"), arising from Defendant's discrimination, discriminatory discharge, and disparate impact against Plaintiff.

## PARTIES

2.      Plaintiff, a Black/African-American male, was previously an employee of Defendant and is a citizen of the Commonwealth of Virginia, residing in Midlothian, Virginia.

1

3. Defendant is a Delaware stock corporation, with a principal place of business of 680 Capital One Dr, McLean, VA, 22102.

4. Defendant has more than 1,000 employees.

5. Defendant is an employer within the meaning of Title VII, the ADEA, and Virginia Law.

6. At all times relevant to this Complaint, Plaintiff was an employee of Defendant.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES, JURISDICTION, AND VENUE

7. On or about October 10, 2023, Plaintiff signed and submitted his Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and cross-filed the Charge with the Virginia Office of Civil Rights, asserting claims for race and age discrimination, including without limitation, discriminatory discharge and disparate impact.

8. On February 24, 2026, Plaintiff received a Determination and Notice of Rights from the EEOC, giving him ninety (90) days to file a lawsuit related to his Title VII and ADEA claims and his Charge of Discrimination.

9. On or about April 15, 2026, Plaintiff received his Notice of Right to File a Civil Action from the Virginia Office of Civil Rights relating to his state law claims under Virginia Law.

10. As such, by filing this Complaint, Plaintiff has timely initiated this Action.

11. This Court has jurisdiction of the claims in this action pursuant to 28 U.S.C. § 1331, as this action contains federal questions presented by Title VII and the ADEA.

12. In addition, this Court has supplemental jurisdiction over Plaintiff's state law claims that arise under Virginia Law pursuant to 28 U.S.C. § 1367(a).

13. Venue is proper in this Court as the acts and/or omissions of Defendant from which Plaintiff's claims arise occurred within Midlothian, Virginia, where Plaintiff worked, which is part

of the territories assigned to the Richmond Division of the Eastern District of Virginia. *See* 28 U.S.C. §1391(b)(2).

**FACTUAL BACKGROUND**

14.     Plaintiff began working for Capital One in 2010, beginning as a cyber security contractor and later receiving an offer to work as a full-time employee.

15.     Plaintiff is Black/African-American and Defendant, including Plaintiff's managers throughout his employment, were aware of his race.

16.     Plaintiff was age 56 at the time of his termination with 12 years' experience.

17.     He quickly ascended the ranks within Capital One and at the time of his termination he held the position title of Manager, Cyber Technical.

18.     He began in that role in 2019, reporting to his manager, William Gardner, and was a member of the "Watch Tower" team within Capital One's Cyber Security Testing organization.

19.     The Watch Tower team reported to Tom Greco (Caucasian), Senior Director, Security Testing Engineering, who in turn reported to Melanie Frank (Caucasian), Managing Vice President Engineering, who in turn reported to Chris Betz (Caucasian), Chief Information Security Officer.

20.     As part of the Watchtower Team, Mr. Hickman was one of three individuals in the Manager, Cyber Technical role reporting to Mr. Gardner and Mr. Greco. The other two were Giancarlo Amente ("Mr. Amente") and Brian Parjari ("Mr. Pajari"). Both Mr. Amente and Mr. Pajari are Caucasian.

21.     In addition, Mr. Hickman was the only African American, as well as the oldest individual, among nine (9) manager-level employees who all reported up to Mr. Greco, the next level supervisor above Mr. Gardner.

22.    In addition, Mr. Amente (upon information and belief, age 44 at the time of Plaintiff's termination) and Mr. Pajari (upon information and belief, age 49 at the time of Mr. Hickman's termination) are both substantially younger than Plaintiff.

23.    Mr. Pajari and Mr. Amente both had less experience at Capital One than Plaintiff, with less tenure in the Manager, Cyber Technical role.

24.    Mr. Amente had only one year experience in the role and at Capital One. Mr. Pajari was not promoted to Manager, Cyber Technical until 2021, and Mr. Amente was not promoted to the role until June 2022.

25.    Beginning from his end-of-year evaluating in 2019, through 2022, Plaintiff received "Strong Performance" ratings on each and every mid-year and end-of-year performance evaluation.

26.    He further received no documented performance concerns, and had no change in duties.

27.    Plaintiff's customers and colleagues also spoke highly of his performance – including his communication, customer focus, teamwork, judgment, problem solving, and results focus.

28.    Plaintiff was also performing at a level equivalent to or higher than Mr. Amente and Mr. Pajari.

29.    Then, at Plaintiff's February 2, 2023 year-end performance review meeting, Mr. Gardner suddenly rated Plaintiff "Inconsistent" for his 2022 end-of-year review.

30.    Prior to this sudden disclosure of "Inconsistent," Mr. Hickman was confident he was once again on track to receive a "Strong" rating. That is because: (i) there had been no change in his responsibilities or work assignments in 2022; (ii) there had been no prior warnings or

concerns documented or communicated in any form; (iii) there had been no performance improvement plan or coaching prior to the reduced rating; and (iv) it was the first negative review – or even negative statement at all – during his tenure under Mr. Gardner.

31. In Capital One's policies, an "Inconsistent" rating is defined as "partially meeting already high expectations," where "Below Strong" indicates that an employee is not meeting an expectation.

32. In reality, Mr. Hickman's performance rating was downgraded after Capital One applied a system of "forced ranking."

33. Forced ranking is a performance management method by which employers grade employees against each other and require a certain minimum percentage of employees to receive negative performance ratings. This practice is often referred to as "rank and yank" because of its tendency to paper an employee's personnel file thereby making it easier for an employer to "yank" or terminate the employee suddenly.

34. Upon information and belief, Capital One policy requires that at least fifteen percent (15%) of employees must receive an "Inconsistent" or "Below Strong" overall rating on their year-end performance review after application of forced ranking, based solely on "rank" and not based on such employee's actual ability to meet their employer's legitimate expectations.

35. While Capital One intentionally avoids using the term "forced ranking," is requires managers to engage in "calibration" and "distribution" in which managers are forced to pit peers against each other and select individuals to rank as underperforming – without justification.

36. The guidance specifically informs managers that: "It is important to keep in mind that expectations are ultimately defined by relative peer comparison. Most teams engage in a best practice of documenting performance expectations before and after calibrations in directorial

'performance benchmarks,' which can be shared with associates to better ensure everyone is working with the same set of directional expectations."

37.    No such expectations were shared with Plaintiff, but it is clear Capital One engaged in its forced ranking process.

38.    In fact, other managers have reported that they are forced to rank individuals below expectations in Capital One's "Calibration" process even when they disagree that the individual is underperforming in any way.

39.    Notably, Capital One's "Calibrations" guidance, at the time of Plaintiff's 2022 year-end review, specifically stated that: "Calibrations are a time for leaders to demonstrate [Capital One's] commitment to Diversity, Inclusion and Belonging and support each other in spotting mitigating potential unconscious biases."

40.    Capital One's actions here were contrary to that commitment.

41.    Mr. Gardner's written feedback in the 2022 year-end performance review made little sense – demonstrating the forced ranking.

42.    The overall summary is highly positive and provides detailed information about each of Mr. Hickman's achievements over the prior year, only to end with a short statement noting that although Mr. Hickman was previously rated "Strong," he suddenly "did not exhibit manager-level strengths relative to his peers."

43.    Further, the feedback provided was vague and subjective. Mr. Hickman was asked to "further develop" certain skills, "exhibit[] ownership" over certain areas, "look for opportunities to grow" in other areas, and "take a more active role."

44.     Given no prior coaching, change in expectation, or any specific examples of his alleged performance issues, Plaintiff was understandably alarmed and upset by such an arbitrary and opaque performance review process.

45.     Plaintiff had received only positive feedback in 2022 from Mr. Gardner and customers, including documented written positive feedback, which included:

    a.  "John showed exemplary customer support for us. He also worked on the tickets we opened for these issues in a timely manner. Very happy to work with him."

    b.  "John is always customer focus, making sure his customers needs are met. Sometimes going above and beyond."

    c.  "He is the go to resource when nobody else knows the answer on how to resolve a finding. His contributions save me a lot of valuable time. Big Thanks to John for all your support."

    d.  "He is always willing to help regardless of who 'owns' the issue. In going back through emails over this past year, there are too many issues he has helped with to list here. His quick and expert help is a necessary component for the Unix team to succeed in resolving Qualys issues. John is a great team player and easy to work with."

46.     In addition, Plaintiff's performance evaluation and review process was not in compliance with Capital One policy. The February 2, 2023 discussion happened after the required deadline and, typically, a coaching plan would have been issued at the February 2, 2023 meeting for an "Inconsistent" rating and for an individual who – allegedly – has "newly emerging performance gaps."

47.    Ultimately, it was not until March 22, 2023, that Mr. Gardner informed Plaintiff that he would have to complete a coaching plan to address the vague performance gaps identified in his 2022 year-end review.

48.    This coaching plan required Plaintiff to meet nearly two (2) dozen vague and subjective expectations and deliverables – from "review[ing] and updating all existing program-related Confluence pages" to "creat[ing] team documentation that details all open risks and issues," and becoming "an epic champion for all program-related work."

49.    Mr. Gardner's decision to delay the coaching plan and then fill it with an inordinate number of expectations and deliverables with no objective or measurable outcomes set Plaintiff up for failure.

50.    The Coaching Plan was even inconsistent with the 2022 review. The coaching plan listed "Communication" as one (1) of only three (3) core "performance issues" to be improved. However, Mr. Gardner had rated Plaintiff "Strong" for communication in his year-end review, which stated that he "conveys information in a compelling and inspiring manner," and "delivers appropriate, direct and straightforward information."

51.    Further, after having a chance to review the Coaching Plan, Plaintiff messaged Mr. Gardner to disclose his concerns about the plan, and asked Mr. Gardner to address the concerns. The concerns included, without limitation, Plaintiff noting the inconsistency regarding his "Communication" evaluation, and stating "it would be helpful to me if I had clear specific defined goals for the policy compliance program in order for me to be successful and be a contributor for the betterment of the team."

52.    Last, as of March 16, 2023, the date on which Mr. Gardner was to meet with Mr. Hickman regarding the coaching plan, the plan had not been approved by Mr. Greco as required.

53.    After significant delay, Mr. Greco, eventually approved the coaching plan.

54.    Mr. Gardner never responded to Plaintiff's concerns. In fact, Mr. Hickman asked Mr. Gardner for a meeting regarding the coaching plan, but Mr. Gardner continually refused to meet, telling Mr. Hickman that Capital One Associate Relations was still looking into it.

55.    Nonetheless, Plaintiff began diligently working to meet the requirements in his coaching plan, and met all of the expectations and deliverables.

56.    It was not difficult because Capital One had no real concern with Plaintiff's performance.

57.    In fact, that same month, in March 2023, while Plaintiff was supposedly underperforming and awaiting a coaching plan, Mr. Gardner assigned Plaintiff to serve as the technical lead for the policy compliance program for Watch Tower.

58.    Nonetheless, Capital One had already made up its mind to target Plaintiff for termination.

59.    Thereafter, during the coaching plan, on or about April 24, 2023, Mr. Greco reassigned the policy compliance program, for which Plaintiff was responsible, to the UK. This diminished Plaintiff's responsibilities and undercut his successful completion of the coaching plan – demonstrating management's plan to force Mr. Hickman out.

60.    Even so, as of May 26, 2023, Plaintiff had met all expectations and deliverables outlined in the plan. Pursuant to Capital One policy, at that time, he should have received notification that he had successfully completed the coaching plan or notice that he was being placed on a Performance Improvement Plant ("PIP").

61.    The only update Plaintiff received was that Mr. Gardner had reached out to Associate Relations for guidance on next steps, and Associate Relations had informed Mr. Gardner

that they were "in the middle of re-working their entire coaching/performance plan process and the additional direction would be provided between June 22nd and June 25th."

62. Then, without any follow up, and nearly two (2) months after completing the plan, on July 24, 2023, Capital One notified Plaintiff that his employment had been terminated as part of an alleged reduction in force ("RIF") and that the termination would be effective October 1, 2023.

63. Capital One informed Plaintiff that he was selected on the basis of his performance. Specifically, the criteria for the alleged RIF was that an employee must have received a "a performance rating of Below Strong at Mid-Year ("MY") 2023 as of July 21, 2023" *and* "received at least one annual or mid-year performance ratings of Inconsistent, Action Required, or Below Strong at MY 2022, Year-End ("YE") 2022, YE 2021, MY 2021, or YE 2020."

64. This corroborated all of Plaintiff's allegations above, confirming that Plaintiff was simply targeted for an "Inconsistent" rating so that Capital One could include him in its pretextual RIF.

65. As such, Capital One selected Mr. Hickman for an alleged reduction despite (i) based on his actual performance, meeting or exceeding the performance of his non-Black and significantly younger peers (Mr. Amente and Mr. Pajari); (ii) having more tenure in the role than Mr. Amente and Mr. Pajari; and (iii) never receiving a mid-year review.

66. Further, Mr. Amente, Mr. Pajari, and other substantially younger employees took over Plaintiff's job responsibilities.

67. As such, Capital One treated Mr. Hickman differently on the basis of his race and/or age.

68.    Only *after* Plaintiff's termination, in its Position Statement to the EEOC, did Capital One claim that Mr. Gardner had recently proposed placing Mr. Hickman on a PIP and that Mr. Hickman would receive a "Below Strong" on his mid-year evaluation.

69.    Plaintiff, however, was never presented with the alleged mid-year evaluation, and did not have an opportunity to respond to the review or contest the rating.

70.    Further, as to any alleged PIP, had Mr. Gardner followed policy, Capital One would have placed Mr. Hickman on the PIP at the end of May 2023, giving Plaintiff the opportunity to complete the PIP before the alleged RIF and before any impact on his mid-year review.

71.    Instead, Capital One's intentional effort to delay any PIP and conceal an alleged future "Below Strong" rating made Mr. Hickman eligible for selection under the October 1, 2023 RIF.

72.    In fact, Mr. Gardner claimed he was instructed not to give Mr. Hickman in his mid-year review by Associate Relations and even claimed that no individuals selected for the RIF were given their mid-year reviews ahead of time – confirming a concerted effort to conceal evaluations and target selected individuals.

73.    Were it for not Capital One's actions, Mr. Hickman would not have been selected for the October 1, 2023 RIF based on his prior "Inconsistent" performance rating alone.

74.    Capital One, through Mr. Gardner, Mr. Greco, and Associate Relations, crafted a plan to select Mr. Gardner for the RIF.

75.    Given his performance and tenure compared to his non-Black and substantially younger peers, as described above, Capital One's actions were based on Plaintiff's race and/or age.

76.    Further, the above treatment of Black employees is consistent with Capital One's treatment of Black employees related to performance management, including those under Mr.

11

Gardner's supervision. By way of example, Bryan Starks, a former Sr. Cybersecurity Engineer reporting to Mr. Garder, was previously terminated for false, subjective, and unjustified "performance" reasons.

77.    Last, Defendant selected employees for inclusion in its RIF using unreasonable criteria and related means that disparately impacted workers age 40 and older, and age 50 and older, including Plaintiff.

78.    In identifying employees for the RIF, Capital One relied on subjective criteria based on Capital One's forced ranking system, which forces managers to select individuals as underperforming, despite their actual performance record.

79.    That policy and practice led to manager's selecting employees with longer tenure and performance histories, leading to a disparate impact based on age.

80.    In identifying employees for the RIF, Capital One also violated its own policies by failing to notify employees of their mid-year review, giving managers complete unfettered discretion to make subjective and false determinations about employees' performance without the ability to respond.

81.    That policy and practice led to manager's selecting employees with longer tenure and performance histories, leading to a disparate impact based on age.

82.    Capital One's decisional unit only included those employees hired prior to January 1, 2022. That policy to select only those employees hired prior to January 1, 2022, also disparately impacts longer tenured and older employees.

83.    Capital One's Older Worker's Benefit Protection Act ("OWBPA") Disclosure related to the RIF indicates that workers age 40 and older, and 50 and older were disproportionately impacted by the RIF.

84. For example, based on the data communicated by Capital One in its OWBPA Disclosure, out of all Manager, Cyber Technical roles considered, employees 50 or older were selected at a rate of 14.3%

85. Out of all Manager, Cyber Technical roles considered, employees 40 or older were selected at a rate of 10.2%.

86. However, out of all Manager, Cyber Technical roles considered, employees under 40 were selected at a rate of 7%.

87. Further, out of all 50 and older employees allegedly considered (regardless of role), approximately 4.8% were selected for termination.

88. Out of all 40 and older employees allegedly considered (regardless of role), approximately 5.8% were selected for termination.

89. However, out of all under 40 employees allegedly considered (regardless of role), only 2.8% of were selected for termination.

90. At the time of his termination, Mr. Hickman was earning a salary of one hundred seventy-five thousand two hundred sixty-three dollars ($175,263) per year with a bonus opportunity range up to twenty-four thousand dollars ($24,000) per year.

## COUNT I – RACE DISCRIMINATION (TITLE VII, VIRGINIA LAW)

91. Plaintiff restates and incorporates the paragraphs above as though fully restated herein.

92. Plaintiff is Black/African-American.

93. Defendant, as explained above, through its intentional selective efforts, targeted Mr. Hickman on the basis of race.

13

94. Further, Plaintiff's non-Black peers reporting to the same manager were not selected for job elimination, even though Plaintiff had more experience and tenure in his role and, on an objective basis, was performing at the same level as his comparators.

95. Defendant does not have a legitimate non-discriminatory reason for Plaintiff's termination.

96. Even if it did, while Capital One claims that it terminated Plaintiff based on performance, Capital One's alleged decision-making is either false and/or pretextual because (without limitation): (i) Plaintiff's "Inconsistent" rating and Coaching Plan are based on vague, subjective, and ambiguous factors, which are contrary to the feedback he received from his own managers and customers in 2022; (ii) Plaintiff's managers and AR failed to follow Capital One policies related to Plaintiff's completion of the Coaching Plan and implementation of subsequent steps; (iii) Plaintiff's "Inconsistent" rating and placement on the Coaching Plan was based on Capital One's forced ranking system, which forces managers to select an employee as not meeting expectations, despite their actual performance; (iv) Capital One never informed Plaintiff of any alleged plan for a PIP or "Below Strong" mid-year review before its decision to terminate his employment; (v) Capital One intentionally concealed Plaintiff's mid-year review when selecting Plaintiff for termination; and (iv) Plaintiff's non-Black peers were kept in the same role despite comparable performance and less tenure in the role.

97. As such, Capital One is liable for race discrimination.

98. As a consequence of Defendant's conduct, Plaintiff has suffered damages, including without limitation, lost wages and benefits, emotional distress, and punitive damages.

## COUNT II – <u>AGE DISCRIMINATION  – DISPARATE TREATMENT (ADEA)</u>

99.     Plaintiff restates and incorporates the paragraphs above as though fully restated herein.

100.    Plaintiff was 56 at the time of his termination.

101.    Defendant, as explained above, through its intentional selective efforts, targeted Mr. Hickman on the basis of age.

102.    Further, Plaintiff's substantially younger peers reporting to the same manager were not selected for job elimination, even though Plaintiff had more experience and tenure in his role and, on an objective basis, was performing at the same level as his comparators.

103.    Defendant does not have a legitimate non-discriminatory reason for Plaintiff's termination.

104.    Even if it did, while Capital One claims that it terminated Plaintiff based on performance, Capital One's alleged decision-making is either false and/or pretextual because (without limitation): (i) Plaintiff's "Inconsistent" rating and Coaching Plan are based on vague, subjective, and ambiguous factors, which are contrary to the feedback he received from his own managers and customers in 2022; (ii) Plaintiff's managers and AR failed to follow Capital One policies related to Plaintiff's completion of the Coaching Plan and implementation of subsequent steps; (iii) Plaintiff's "Inconsistent" rating and placement on the Coaching Plan was based on Capital One's forced ranking system, which forces managers to select an employee as not meeting expectations, despite their actual performance; (iv) Capital One never informed Plaintiff of any alleged plan for a PIP or "Below Strong" mid-year review before its decision to terminate his employment; (v) Capital One intentionally concealed Plaintiff's mid-year review when selecting

15

Plaintiff for termination; and (iv) Plaintiff's substantially younger peers were kept in the same role despite comparable performance and less tenure in the role.

105.    As such, Capital One is liable for age discrimination.

106.    As a consequence of Defendant's conduct, Plaintiff has suffered damages, including without limitation, lost wages and benefits, and liquidated damages.

## COUNT III – AGE DISCRIMINATION – DISPARATE IMPACT (ADEA)

107.    Plaintiff restates and incorporates the paragraphs above as though fully restated herein.

108.    Plaintiff alleges that Defendant selected employees for inclusion in its RIF using unreasonable criteria and related means that caused the terminations to significantly, disparately, and adversely affect workers age 40 and older, and age 50 and older, including Plaintiff.

109.    In identifying employees for the RIF, Capital One relied on subjective criteria based on Capital One's forced ranking system, which forces managers to select individuals as underperforming, despite their actual performance record.

110.    That policy and practice led to manager's selecting employees with longer tenure and performance histories, leading to a disparate impact based on age.

111.    In identifying employees for the RIF, Capital One also violated its own policies by failing to notify employees of their mid-year review, giving managers complete unfettered discretion to make subjective and false determinations about employees' performance without the ability to respond.

112.    That policy and practice led to manager's selecting employees with longer tenure and performance histories, leading to a disparate impact based on age.

113. Capital One's decisional unit only included those employees hired prior to January 1, 2022. That policy to select only those employees hired prior to January 1, 2022, also disparately impacts longer tenured and older employees.

114. Capital One's OWBPA Disclosure related to the RIF indicates that workers age 40 and older, and 50 and older were disproportionately impacted by the RIF.

115. For example, based on the data communicated by Capital One in its OWBPA Disclosure, out of all Manager, Cyber Technical roles considered, employees 50 or older were selected at a rate of 14.3%

116. Out of all Manager, Cyber Technical roles considered, employees 40 or older were selected at a rate of 10.2%.

117. However, out of all Manager, Cyber Technical roles considered, employees under 40 were selected at a rate of 7%.

118. Further, out of all 50 and older employees allegedly considered (regardless of role), approximately 4.8% were selected for termination.

119. Out of all 40 and older employees allegedly considered (regardless of role), approximately 5.8% were selected for termination.

120. However, out of all under 40 employees allegedly considered (regardless of role), only 2.8% of were selected for termination.

121. As a consequence of Defendant's conduct, Plaintiff has suffered damages, including without limitation, lost wages and benefits, and liquidated damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment against Defendant and order that Plaintiff is entitled to all damages available under the law to be proven at trial, including without limitation, equitable relief, compensatory damages, lost wages and benefits, emotional distress damages, liquidated damages, punitive damages, together with prejudgment interest, attorneys' fees and costs for prosecuting Plaintiff's claims, and such further relief available under the law.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all counts set forth herein.

Respectfully submitted,

By:    */s/ Mark J. Passero*
Mark J. Passero (VSB No. 90463)
LawrenceQueen
701 East Franklin Street, Suite 700
Richmond, Virginia 23219
Telephone: (804) 643-9343
Facsimile: (804) 643-9368
mpassero@lawrencequeen.com
kporter@lawrencequeen.com

*Counsel for Plaintiff*

18